# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 5, 2007

Charles R. Fulbruge III
Clerk

No. 06-20395

GENERAL RETAIL SERVICES, INC

Plaintiff - Appellant

v.

WIRELESS TOYZ FRANCHISE, L L C; JACK BARBAT; JOE BARBAT;
DAVID EBNER; JSB ENTERPRIZES INC; RICHARD SIMTOB

Defendants - Appellees

Appeal from the United States District Court
for the Southern District of Texas, Houston
No. 4:05-CV-744

Before KING, DAVIS, and BARKSDALE, Circuit Judges.

KING, Circuit Judge:[*]

On June 10, 2005, Plaintiff-appellant General Retail Services, Inc.,
("General Retail") and its owner, Steven Wiley, filed Plaintiffs' First Amended
Complaint against: (1) Wireless Toyz Franchises, L.L.C. ("Wireless Toyz"); (2)
JSB Enterprizes, Inc. ("JSB"); and (3) officers of the two corporations, Joe
Barbat, David Ebner, Richard Simtob and Jack Barbat ("Individual
Defendants"). General Retail and Wiley alleged, in support of multiple common

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

law and statutory claims, that the defendants induced them to purchase a franchise by intentionally, recklessly or negligently making false misrepresentations. Additionally, they claimed that Wireless Toyz and JSB breached the Franchise Agreement by wrongfully withholding commissions and fees. Finally, they sought an accounting to determine how much money had been withheld.

On June 26, 2005, the defendants jointly filed a motion to dismiss, although not every defendant joined in each ground for dismissal. Individual Defendants moved to dismiss for lack of jurisdiction or, alternatively, to transfer venue. Individual Defendants and JSB moved to dismiss for failure to state a cause of action. All of the defendants, including Wireless Toyz, moved to dismiss the plaintiffs' fraud and deceptive trade practice claims for failure to plead with particularity.

On November 17, 2005, the district court granted the defendants' motion to dismiss the fraud claims, and Individual Defendants' motion to dismiss for lack of jurisdiction. It sua sponte dismissed Wiley's claims because he was not a party to the Franchise Agreement. And it entered summary judgment for all of the defendants by converting the motion to dismiss for failure to state a claim into a motion for summary judgment. The district court held that a merger clause in the Franchise Agreement–which was not raised in the motion to dismiss–barred General Retail's claims. Moreover, it found that there was neither evidence of fraud nor specific allegations of fraud. Nevertheless, it ordered General Retail to amend its fraud and breach of contract claims. In the end, the district court struck General Retail's subsequent Second Amended Complaint, denied General Retail's motion for leave to file a third amended complaint, and entered its Final Judgment.

General Retail now appeals the district court's: (1) dismissal of Individual Defendants for lack of personal jurisdiction; (2) dismissal of its fraud claims for

failure to plead with particularity; and (3) entry of summary judgment. General Retail also appeals the district court's subsequent orders, including its orders: (4) denying the plaintiffs' motion for reconsideration; (5) striking General Retail's Second Amended Complaint; (5) denying General Retail's motion for leave to file a third amended complaint; and (6) entering final judgment. Wiley originally joined in the appeal, but subsequently withdrew. We address each of General Retail's points on appeal in detail below.

## I.  FACTUAL AND PROCEDURAL BACKGROUND[1]

This case arises from General Retail's purchase of a Wireless Toyz franchise. General Retail is a Texas corporation, with its principal place of business in Houston, Texas. Wireless Toyz is a Michigan limited liability corporation with its principal place of business in Farmington Hills, Michigan. It franchises retail stores that sell electronic communication devices and services. Franchisees earn commissions and fees from the sale of third-party telephone service contracts.

JSB, a Michigan corporation, is affiliated with Wireless Toyz and shares the same principal place of business. While JSB independently operates its own retail stores, it also does business with Wireless Toyz franchisees. Under Wireless Toyz franchise agreements, franchisees must: (1) purchase inventory from JSB; (2) sell telephone service contracts from JSB approved companies only; and (3) appoint JSB as their agent for the collection of revenues earned from third-party telephone companies.

Individual Defendants, Michigan residents all, are owners and officers of Wireless Toyz, JSB or both. Joe Barbat is the owner and president of both corporations. Ebner is the secretary and treasurer of Wireless Toyz, and the chief financial officer of JSB. Simtob is the vice president of franchise

---

[1] Unless otherwise noted, the facts presented herein are taken from Plaintiffs' First Amended Complaint.

development for Wireless Toyz. And Jack Barbat is the vice president of operations of JSB. Moreover, according to their deposition testimony, Ebner and Simtob are also minority shareholders of Wireless Toyz and Jack Barbat is also the vice president of operations of Wireless Toyz.[2]

In early 2003, a General Retail shareholder, Wiley, was searching for business opportunities on the internet when he learned about Wireless Toyz franchises. Interested, he contacted Wireless Toyz, spoke with Simtob and requested additional information. In response, Simtob mailed Wiley various marketing materials and a "Wireless Toyz Franchise Offering Circular" ("Offering Circular").

The marketing materials include claims about the benefits of opening a Wireless Toyz franchise, as compared to an independent start-up store. These benefits included: (1) a reduction in the working capital necessary to achieve an operations "break even" point; (2) access to Wireless Toyz's lease negotiation skills; (3) consulting support from Wireless Toyz; and (4) greater purchasing power due to the volume of Wireless Toyz's business. In total, franchisees would save over $10,000 their first year and at least $20,000 overall.

The Offering Circular, meanwhile, was a financial disclosure package. In Item 19 of the Offering Circular, Wireless Toyz forecasted that the model franchise store would be profitable at a gross sales rate of $589,327. The model was purportedly created by averaging the financial results of five JSB stores, which were themselves calculated in accordance with generally accepted

---

[2] The record is not entirely free of confusion as to Individual Defendants' precise relationship with the corporations. Wireless Toyz, the only defendant to answer, mostly admitted the relevant allegations, but refused to admit that Jack Barbat is a vice president of JSB. The individuals' testimony generally corroborated the allegations, but some of the defendants were uncertain of their exact titles or positions. Simtob, meanwhile, testified that he was actually an independent contractor when the events giving rise to this dispute first began. Nevertheless, to the extent this court must look beyond the pleadings to resolve any of the issues on appeal, these distinctions are immaterial.

accounted principles. Other than location, the Offering Circular explicitly stated that there were no material differences between the stores being franchised and those being used to complete the schedule. Nor were there any material differences between the operations of the stores. Wiley, therefore, used this information to estimate the potential investment returns General Retail could expect from a Wireless Toyz franchise.

Still interested after making his projections, Wiley traveled to a Wireless Toyz "discovery day" program where he met with Simtob and Ebner. Simtob picked him up at the airport and drove him to the top performing store. Along the way, Simtob claimed that the store realized approximately $400,000 in net profits the past year by selling, on average, four hundred telephone service contracts per month. Simtob also asked Wiley whether he had used the Offering Circular to make any of his own estimates. When Wiley told him he had, and what his estimates were, Simtob assured Wiley that if Wiley did not earn more than he had estimated, Simtob would not be selling Wireless Toyz franchises.

Based on all the information Wiley received through the marketing materials, the Offering Circular, the "discovery day" program, and his conversations with Wireless Toyz officers, General Retail decided to purchase a Wireless Toyz franchise. Accordingly, on July 28, 2003, General Retail executed the Franchise Agreement. It paid a franchising fee, purchased inventory from JSB, and entered into a long-term commercial lease.

After start-up was underway, however, Simtob told Wiley that substantially more expenses were necessary than stated in the Offering Circular and marketing materials. General Retail shouldered the additional expenses, opened its doors for business and quickly began to outperform the sales levels depicted in the Offering Circular's model. Yet the store failed to produce any significant profit. Because General Retail was beating the model store's

performance without profits, Wiley believed that representations in the Offering Circular and marketing materials were simply false.

On January 31, 2005, General Retail and Wiley filed Plaintiffs' Original Petition in the District Court of Harris County, Texas, 190th Judicial District, against Wireless Toyz. They brought counts of fraud and violation of the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA"), Tex. Bus. & Com. Code Ann. § 17.41 et seq. (Vernon 2001). In support, they alleged that they were fraudulently induced to purchase a franchise by Wireless Toyz's "serious misrepresentations," including misrepresentations concerning the gross level of sales necessary for a franchise to reach a financial "break even" point. On March 2, 2005, Wireless Toyz filed its Answer to Plaintiffs' Original Petition. It consisted of a general denial and raised no affirmative defenses. Five days later, Wireless Toyz removed the case to the United States District Court for the Southern District of Texas under 28 U.S.C. § 1441(b).

The district court promptly set a scheduling conference for June 13, 2005, but motion practice began well before then. Wireless Toyz moved to transfer venue because the Franchise Agreement's forum selection clause set Illinois as the proper venue for litigation.[3] Shortly thereafter, the plaintiffs moved for leave to depose a third-party witness before the Rule 26(f) scheduling conference because they were contemplating filing a motion for preliminary injunction. Immediate discovery was necessary, they argued, to show Wireless Toyz was retaliating against them by manufacturing a cause for termination of the Franchise Agreement. The district court denied both motions.

On May 5, 2005, still a month before the district court's initial scheduling conference, the plaintiffs moved for leave to file Plaintiffs' First Amended

---

[3] Notably, it is at this point that Wireless Toyz introduced into the record–for the first time–the Franchise Agreement and, more specifically, the merger clause that the district court would later rely upon to enter summary judgment.

Complaint. They sought to add new claims, described below, and new defendants, namely, JSB and Individual Defendants. Wireless Toyz opposed the motion. It argued that the amendment was futile because the new allegations failed to state any claims upon which relief could be granted. Wireless Toyz's attacks on the proposed claims were, in almost every respect, identical to those JSB and Individual Defendants would later assert in their 12(b)(6) motion, which the district court converted into the motion for summary judgment. Nevertheless, on June 8, 2005, the district court granted the motion to amend in a short order that did not address the sufficiency of the pleadings.

The First Amended Complaint contained eight counts, plus requests for special damages, and attorneys' fees and costs that were styled as counts. Count I was a claim for breach of contract. It alleged that Wireless Toyz and JSB, a non-signatory with "contractual obligation[s]," breached the Franchise Agreement by withholding commissions and other residual payments. Because General Retail was required to appoint JSB its agent for collection of commissions and other fees, JSB was obligated to disburse those monies to General Retail in accordance with the terms of the Franchise Agreement. Its alleged failure to do so constituted a breach of the Franchise Agreement by both corporate defendants.

Counts II-VI, with the exception of subsections in Counts III and IV, were recasts of the original claims under new guises and with more detail. They included claims against all of the defendants for: (1) negligent misrepresentation; (2) fraud; (3) violations of the DTPA; and (4) violations of the Michigan Franchise Investment law ("MFIL"), Mich. Stat. Ann. § 41.1501 et seq. In addition, a separate claim against Wireless Toyz was brought for violations of the Texas Business Opportunity Act ("TBOA"), Tex. Bus. & Com. Code Ann. § 41.001 et seq. (Vernon 2001). In support of each count, the plaintiffs alleged

the same nine misrepresentations, which were made in either the Offering Circular or the marketing materials.

The remaining claims returned to the allegation that General Retail's commissions and residual payments were being withheld. Subsections of Counts III and IV, fraud and violations of the DTPA, respectively, alleged that the defendants fraudulently commenced a continuing pattern of withholding those monies. Count VII requested an accounting from the defendants of all fees collected from telephone companies based on General Retail's sales. Finally, Count VIII alleged that the defendants engaged in a conspiracy to: (1) induce the plaintiffs to invest in a franchise; (2) enrich themselves at the plaintiffs' expense; and (3) "asphyxiate" the plaintiffs once they asserted their legal rights by withholding their commissions and residual payments.

On June 16, 2005, following its scheduling conference, the district court issued an order setting February 28, 2006, as the deadline for completing discovery and filing dispositive motions.[4] On July 8, 2005, Wireless Toyz filed its Answer to Plaintiffs' First Amended Complaint, which, like its original answer, raised no affirmative defenses.

On June 26, 2005, the Individual Defendants filed a Motion to Dismiss for Lack of Personal Jurisdiction or Alternatively to Transfer Venue, and all the defendants filed Defendants' Motion to Dismiss Under 12(b)(6) and Failure to Plead in Conformity with Rule 9 (collectively the "Omnibus Motion"). The Omnibus Motion was filed as a single document, along with two separate

---

[4] Before answers to the First Amended Complaint were due, General Retail filed a motion for partial summary judgment against Wireless Toyz. It sought an award totaling $118,853.69 and offered evidence that it had not received either commissions or residual payments since February 1, 2005. General Retail claimed immediate resolution was necessary because it was being deliberately "cashed starved" in an attempt to create cause for termination. In opposition, Wireless Toyz argued that it could not pay General Retail until after discovery because it could not ascertain how much it owed General Retail and General Retail was refusing to cooperate with the accounting issues. The district court denied General Retail's motion without prejudice.

memoranda of law–one supporting the jurisdictional and venue arguments (hereinafter the "12(b)(2) Motion") and one supporting the attack on the sufficiency of the pleadings (hereinafter the "12(b)(6) Motion"). In addition, Individual Defendants submitted an appendix of exhibits, which contained Individual Defendants' affidavits and Plaintiffs' Initial Disclosure, but only in support of its 12(b)(2) Motion. The affidavits mostly addressed the defendants' alleged lack of contacts with Texas and General Retail. They did not address substantive issues of the case.

The defendants' arguments were straight forward. In their 12(b)(2) Motion, Individual Defendants argued that the First Amended Complaint failed to establish personal jurisdiction over them because there was not a single allegation that Joe Barbat, Jack Barbat or Ebner had any contacts with Texas, and Simtob's only alleged actions were either in Michigan or shielded by Texas' fiduciary-shield doctrine. While they also moved, in the alternative, to transfer venue, they spent very little time on this issue, no doubt because the district court had already denied Wireless Toyz's motion to transfer.

In their 12(b)(6) Motion, JSB and Individual Defendants argued that elements of each action were missing from the allegations. Specifically, they argued that the plaintiffs did not plead: (1) any false statements that those specific defendants made in connection with the negligent misrepresentation, fraud, DTPA and MFIL claims; (2) unconscionability with regard to the DTPA claim; (3) complexity in support of the accounting claim; (4) a meeting of the minds, an overt act or an underlying tort in connection with the conspiracy claim; and (5) privity in connection with the breach of contract action. Similarly, with Wireless Toyz joining, they argued that the fraud and DTPA claims failed to meet the heightened pleading requirements of Rule 9(b) because the First Amended Complaint did not identify the time, place and contents of the false representations, or the identity of the person making the statements.

On October 11, 2005, the plaintiffs filed their Response to the 12(b)(2) Motion and 12(b)(6) Motion ("Omnibus Response").[5] The Omnibus Response was only a summary of arguments made in three accompanying memoranda of law. The first two memoranda were briefs opposing Individual Defendants' jurisdictional and venue arguments (collectively "12(b)(2) Response"). The third was both Plaintiffs' Motion for Leave to File a Second Amended Complaint and a brief supporting the sufficiency of the First Amended Complaint ("12(b)(6) Response"). Finally, the plaintiffs filed an appendix of exhibits entitled: "Appendix of Exhibits to Plaintiffs' Response to Defendants' Motions to Dismiss Under Rule 12(b)(2) and Rule 12(b)(6) and to Defendants' Alternative Motion to Transfer Venue" ("Plaintiffs' Appendix") (emphasis added). Plaintiffs' Appendix contained, amongst other exhibits, a three page excerpt of the Franchise Agreement. Mostly, though, it contained depositions and other evidence concerning Individual Defendants' contacts with Texas and their relationships to Wireless Toyz and JSB.

On November 17, 2005, the district court ruled on the Omnibus Motion. It prefaced its decision by converting the 12(b)(6) Motion into a motion for summary judgment "[b]ecause the parties have attached exhibits to the motion to dismiss and response . . . ." It then dismissed Wiley's claims because a review of the documents established that he was not a party to any agreement. Ruling on Individual Defendants' 12(b)(2) Motion, it determined that Individual Defendants' contacts with Texas were insufficient to create personal jurisdiction.

Turning to General Retail, the district court found two "stops" to its misrepresentation claims. First, the court determined that the Franchise Agreement's merger clause, which was included in the excerpts attached to

---

[5] The nearly three-month response time occurred because the district court permitted the plaintiffs to take Individual Defendants' depositions. Discovery was limited to the jurisdictional issues over the plaintiffs' objection.

Plaintiffs' Appendix, barred claims based on alleged misrepresentations made before the Franchise Agreement was signed. Neither party had raised the issue. Second, it determined "there [was] no evidence of any specific acts of fraud." Nor were there even "specific allegations setting forth the alleged misleading statements . . . in the [Offering Circular] and/or marketing materials" as required by Rule 9(b). Despite the fact that the district court apparently entered summary judgment against the fraud claims, it ordered General Retail to amend its pleadings within thirty days "if it [could] do so on its fraud and breach of contract claims against the corporate defendants."

On November 23, 2005, the plaintiffs filed a motion for reconsideration. Aside from the merits, they argued that the court improperly converted the 12(b)(6) Motion into a motion for summary judgment because neither party submitted any evidence in connection with it and they did not receive any notice that the court was contemplating entering summary judgment. On December 12, 2005, with the thirty day deadline to amend approaching but still no order on their motion for reconsideration, General Retail and Wiley filed Plaintiffs' Second Amended Complaint against all the defendants. In response, the defendants filed a motion to strike because the inclusion of Wiley and Individual Defendants violated the district court's November 17, 2005 order. Only on January 10, 2006, after the district court denied the motion for reconsideration, did General Retail file a response to the defendants' motion to strike. At the same time, it moved for leave to file a third amended complaint, stating that it had filed the non-conforming complaint pending resolution of the motion for reconsideration because it feared waiving its arguments otherwise.

On February 8, 2006, the district court struck Plaintiffs' Second Amended Complaint. On March 22, 2006, with General Retail's motion for leave to file a third amended complaint still pending, Wireless Toyz and JSB filed their Suggestion of Final Judgment. On April 5, 2006, the district court issued an

order denying General Retail leave to amend. On the same day, it entered Final Judgment against General Retail. At no point did the district court explain why it was entering judgment against the plaintiffs' breach of contract claim against Wireless Toyz, which was never subject to a challenge on the merits.

## II. DISCUSSION

### A. Conversion to Summary Judgment

#### 1. Sufficiency of Notice

We review a grant of summary judgment de novo, viewing all the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. See Crawford v. Formosa Plastics Corp., 234 F.3d 899, 902 (5th Cir. 2000). "Summary judgment is proper when the evidence reflects no genuine issues of material fact and the non-movant is entitled to judgment as a matter of law." Id. (citing Fed. R. Civ. P. 56(c)). "A genuine issue of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

Before reaching the merits, however, we must determine whether the district court properly converted the 12(b)(6) Motion into a motion for summary judgment. It is well known that when "matters outside the pleading" are presented with a motion to dismiss under Rule 12(b)(6), a district court has complete discretion to either accept or exclude the evidence. Isquith v. Middle S. Utils., Inc., 847 F.2d 186, 193 (5th Cir. 1988); see also Fed. R. Civ. P. (12)(b). Indeed, a district court is empowered to enter summary judgment sua sponte. See Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986) (stating that "[i]t would surely defy common sense to hold that the District Court could have entered summary judgment sua sponte in favor of petitioner . . . but that petitioner's filing of a motion requesting such a disposition precluded the District Court from ordering it"). Still, when a district court "grants a motion styled a motion to

12

dismiss, but bases his ruling on facts developed outside the pleadings, or sua sponte enters an order for summary judgment, the appellate court will review the order under the standards laid down in [Rule 56.]" Estate of Smith v. Tarrant County Hosp. Dist., 691 F.2d 207, 208 (5th Cir. 1982) (citations omitted).

Under Rule 56(c), the nonmovant is entitled to ten days notice before entry of summary judgment. St. Paul Mercury Ins. Co. v. Williamson, 224 F.3d 425, 435 (5th Cir. 2000) (citation omitted); Washington v. Allstate Ins. Co., 901 F.2d 1281, 1284 (5th Cir. 1990). The purpose of this rule is twofold. First, it prevents surprise to the party that judgment is entered against. Clark v. Tarrant County, TX, 798 F.2d 736, 745 (5th Cir. 1986); see Powell v. United States, 849 F.2d 1576, 1580 (5th Cir. 1988) (holding that even on the morning of trial notice must be given because "preparation for trial is very different from that required to oppose a summary judgment motion"); W. Fire Ins. Co. v. Copeland, 786 F.2d 649, 652 (5th Cir. 1986) (same); Hickey v. Arkla Indus., Inc., 615 F.2d 239, 240 (5th Cir. 1980) (stating that an appellate court will not assume that plaintiff has already produced all his "ammunition" unless the nonmoving party knew he was facing a final adjudication on the merits). Second, it prevents the use of summary judgment to prematurely cut off discovery. Clark, 798 F.2d at 746; see Benchmark Elecs., Inc. v. J.M. Huber Corp., 343 F.3d 719, 725-26 (5th Cir. 2003) (holding that the district court unfairly converted the motion for judgment on the pleadings into a summary judgment motion when it had previously stayed discovery).

A district court, therefore, abuses its discretion if it fails to provide sufficient notice. Resolution Trust Corp. v. Sharif-Munir-Davidson Dev. Corp., 992 F.2d 1398, 1403 (5th Cir. 1993) Such is the strictness of the enforcement of the rule in this circuit, we have found it an abuse of discretion for a district court to grant a motion for summary judgment that has been pending for three months

because the nonmovant was not on notice that the district court "contemplated" ruling upon it. Sharif-Munir-Davidson Dev. Corp., 992 F.2d at 1403; see also Judwin Props, Inc. v. U.S. Fire Ins. Co., 973 F.2d 432, 436-37 (5th Cir. 1992) (stating that "[e]ven though summary judgment may have been proper on the merits[,] . . . [the plaintiff was] entitled to an opportunity to present its case to the district court prior to such dismissal"); Young v. Biggers, 938 F.2d 565, 568 (5th Cir. 1991) (holding that converting the defendants' motion to dismiss because other defendants had moved in the alternative for summary judgment was improper); Powell, 849 F.2d at 1579 (stating that this court strictly enforces the ten day notice requirement in conversion cases); Hickey, 615 F.2d at 240 (finding improper notice even though the plaintiff filed opposing evidence because he only had four days to respond).

Importantly, "it is not necessary that the district court give ten days' notice after it decides to treat a Rule 12(b)(6) motion as one for summary judgment, but rather after the parties receive notice that the court could properly treat such a motion as one for summary judgment . . . ." Washington, 901 F.2d at 1284 (quoting Clark, 798 F.2d at 746). Thus, the proper question is whether the nonmovant was on notice that the "the district court could treat the motion as one for summary judgment, not [whether] the court would in fact do so." Id. (citing Isquith, 847 F.2d at 193). Even so, any reasonable doubts about whether a nonmovant received notice are resolved in favor of that party. HS Resources, Inc. v. Wingate, 327 F.3d 432, 437-38 (5th Cir. 2003) (citing NL Indus., Inc. v. GHR Energy Corp., 940 F.2d 957, 965 (5th Cir. 1991)); St. Paul Mercury Ins. Co., 224 F.3d at 435 (choosing not to view the district court's comments at oral argument as notice of intent to enter summary judgment).

Finally, we note an obvious threshold question that often arises and which is relevant to the present dispute.[6] Namely, what are "matters outside the pleadings?" See Fed. R. Civ. P. (12)(b). According to Wright and Miller:

> [m]ost federal courts . . . have viewed the words "matters outside the pleadings" as including any written or oral evidence introduced in support of or in opposition to the motion challenging the pleading that provides some substantiation for and does not merely reiterate what is said in the pleadings. Memoranda of points and authorities as well as briefs and oral arguments in connection with the motion, however, are not considered matters outside the pleadings for purposes of conversion. The same is true for various types of exhibits that are attached to the pleadings, matters of which the district court can take judicial notice, and items of unquestioned authenticity that are referred to in the challenged pleading and are "central" or "integral" to the pleader's claim for relief.

Wright & Miller, supra, § 1366 (citations omitted). And for our purposes, it is enough that submitting evidence in connection with a separate motion, involving different issues, does not constitute submission of evidence with a contemporaneously filed Rule 12(b)(6) motion to dismiss. Benchmark Elecs., Inc., 343 F.3d at 725-726 (holding that an affidavit submitted with a partial motion for summary judgment did not justify converting a motion for judgment on the pleadings).

---

[6] Of course, when this question arises, it usually involves a question as to whether a defendant can attach a document to a complaint without converting the motion into a motion for summary judgment. See, e.g., Collins v. Morgan Stanley Dean Witter, 224 F.3d 496, 498-99 (5th Cir. 2000) (stating that documents a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the complaint and are central to the plaintiff's claims). Cases like the present are less common since "[t]actically, the pleader is unlikely to initiate the introduction of outside material . . . because if he does, the defendant's Rule 12(b)(6) motion, which usually is not granted on the merits, will be converted into a motion for summary judgment and may result in a binding final determination against him." 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1366 (3d ed. 2004) (citations omitted).

With all of this in mind, we now turn to this case. General Retail makes three basic arguments: (1) neither it nor the defendants submitted any materials outside the pleadings to the district court in connection with the 12(b)(6) Motion; (2) it had no notice that the district court would consider the matter on summary judgment until it received the November 17, 2005 Order because neither party presented matters outside the pleadings or otherwise invited the court to consider the motion as a motion for summary judgment; and (3) what the district court actually did was grant summary judgment sua sponte on an affirmative defense never raised. In response, the defendants argue that the plaintiffs submitted non-pleading matters on four separate occasions.[7] Further, they assert that General Retail cannot complain about the lack of notice because it was the party that submitted the documents and a party that submits outside matters has constructive notice that conversion is possible. Finally, they argue that to the extent the court entered judgment sua sponte, the district court's failure to give notice was harmless error.

Since the district court never identified what matter triggered the conversion, we will review the four non-pleading matters identified by the defendants. However, we do not resolve whether each alleged non-pleading matter was presented to the court. Neither party fully addressed the issue and we need not reach an answer to decide the case. Nevertheless, we set them forth below because their subject matter informs our analysis of Rule 56(c)'s notice prong.

First, the defendants argue that conversion was proper because General

---

[7] The defendants implicitly concede—as they must—that the district court erred when it found that conversion was necessary because "the parties attached exhibits to the motion to dismiss and response." (Nov. 17, 2005 Order) (emphasis added). The defendants never cited to any exhibits, or made any reference to exhibits, in their 12(b)(6) Motion. Moreover, the Omnibus Motion stated that the defendants' appendix of exhibits was being submitted in support of the 12(b)(2) Motion.

Retail referred to the contents of the Franchise Agreement in its 12(b)(6) Response. In support of its DTPA claim, General Retail tried to show that its allegations were in connection with the sale or lease of goods as required by the DTPA, by noting that "[w]ithin the Franchise Agreement, the Defendants obligated [General Retail] to purchase product [sic] from them and, in return, commissions and residual payments would be made." General Retail did not support this statement with a citation to the Franchise Agreement in Plaintiffs' Appendix. Nor could it because the excerpt did not contain the relevant clauses. Nevertheless, the defendants suggest that conversion was proper on this basis because General Retail made a reference to the Franchise Agreement and the Franchise Agreement was previously introduced into the record.[8]

General Retail responded, and we agree, that the reference to the Franchise Agreement does not support conversion because the provisions referred to were part of the pleadings. The plaintiffs quoted paragraph 6.2 of the Franchise Agreement, which deals with General Retail's right to residual payments and commissions, in the First Amended Complaint. Elsewhere, the plaintiffs alleged that General Retail was required to purchase inventory from JSB in return for these payments. Thus, the plaintiffs did not introduce any

---

[8] The defendants do not go so far as to suggest that the district court actually relied on the full Franchise Agreement, as opposed to the three-page excerpt attached in Plaintiffs' Appendix. This seems wise because there is reason to believe that the district court did not review more than the excerpts. In its November 17, 2005 Order, the district court found that Wiley signed the Franchise Agreement in his capacity as president of FIG Investments, Inc. ("FIG"), and expressed concern about the lack of pleadings connecting General Retail to FIG. The district court assumed for purposes of its order that FIG was incorporated to raise capital, while General Retail was incorporated to operate the store. However, when Wireless Toyz first introduced the Franchise Agreement into the record, Simtob explained, in an accompanying affidavit, that the reference to FIG was a drafting error. FIG was another potential Wireless Toyz franchisee whose name was mistakenly substituted for General Retail's on the signature page. As Simtob pointed out, this mistake is apparent when looking at the entire Franchise Agreement. It is not as apparent from the three-page excerpt submitted with Plaintiffs' Appendix. The potential for making mistakes of this kind has led us to caution district courts that, although fully empowered to do as they see fit, the best path when presented with outside materials of limited nature is to exclude them. See Isquith, 847 F.2d at 194 n.3.

support for their arguments beyond the allegations in the First Amended Complaint.

Second, the defendants argue that conversion was justified on the theory that the title of Plaintiffs' Appendix—"Appendix of Exhibits to Plaintiffs' Responses to Defendants' Motions to Dismiss Under Rule 12(b)(2) and Rule 12(b)(6) and to Defendants' Alternative Motion to Transfer"—speaks for itself. The defendants assert that, in light of the name the plaintiffs gave their own appendix, it was reasonable for the district court to have relied on the materials contained therein. General Retail argues that Plaintiffs' Appendix did not present matters outside the pleading to the district court because the attached exhibits were never incorporated into its 12(b)(6) Response and the seemingly conclusive title was a regrettable, but obvious, mistake.

A review of all the papers filed by the plaintiffs indicate Plaintiffs' Appendix was mistakenly titled, and obviously so. The text of Plaintiffs' Appendix states that "attach[ed are] the following exhibits to [Plaintiff's] Responses to Defendants' Motions to Dismiss Under Rule 12(b)(2) and to Defendants' Alternative Motion to Transfer Venue" So while it referenced the plaintiffs' other responses, it omitted reference to the 12(b)(6) Response. Also, the accompanying certificate of service refers to an appendix bearing a different name—"Appendix to [Plaintiff's] Responses to Defendants' Motions to Dismiss Under Rule 12(b)(2) and to Defendants' Alternative Motion to Transfer Venue"—which similarly omits reference to the 12(b)(6) Response. But if there is any doubt, the Omnibus Response was explicit:  "[t]he Appendix filed contemporaneously with this Response is incorporated as if fully restated herein into this Response to Defendants [sic] 12(b)(2) and 12(b)(3) Motion (but not into the Response to the 12(b)(6), so it is not converted into a Motion for Summary

Judgment)." On the issue of mistake, then, General Retail prevails.[9]

The third and fourth instances of non-pleading matters the defendants point to involve the plaintiffs' arguments in opposition to application of the fiduciary-shield doctrine. With regard to Individual Defendants, collectively, the plaintiffs stated that: "[t]he facts supporting Plaintiffs' claims of their direct involvement are found within Section II.A.1 of Plaintiffs 12(b)(2) Response Brief and are incorporated into this discussion as if fully restated herein (though not to the extent that would convert this filing into a Motion for Summary Judgment)." With regard to Simtob, specifically, the plaintiffs referred without citation to testimony gathered from Simtob's deposition to show why his actions were not taken in a corporate capacity.

The defendants argue that the district court could consider outside matters despite the lack of citation to Simtob's deposition or the express limitation in the incorporation statement because it would be unfair for a party to gain the benefit of presenting non-pleading materials without having to risk the consequences. General Retail relies, in response, on the express limitation of the incorporation in the 12(b)(6) Response and its and Wiley's repeated statements that they were not incorporating any evidence. General Retail also argues that Simtob's testimony concerned his corporate role, which was something touched upon in the First Amended Complaint.

In fact, much of the factual statements the plaintiffs' incorporated were outside the pleadings, as were the references to Simtob's testimony. For example, Simtob testified that he was an independent contractor at the time the Franchise Agreement was signed, while in the First Amended Complaint he was alleged to be a Wireless Toyz vice president. The plaintiffs used this distinction

---

[9] It is unlikely so obvious a mistake would permit us to impute constructive knowledge on General Retail as urged by the defendants. However, we do not have to resolve this issue to decide the case.

to their advantage to try and defeat Simtob's fiduciary-shield defense. Although we are concerned with this tactic, we do not resolve whether the plaintiffs' references and putative limited incorporations constitute the presentation of matters outside the pleadings. Even if they did, the district court was not justified to enter judgment based on the merger clause since neither party addressed the issue and the matters presented to the district court did not develop the issue.

Under Rule 56, a party must receive more than generalized notice that summary judgment could happen. It must know what is being considered so that it can have a real opportunity to respond. See Davis v. Howard, 561 F.2d 565, 572 (5th Cir. 1977). Sua sponte summary judgment is procedurally fair "so long as the losing party was on notice that she had to come forward with all of her evidence." Celotex Corp, 477 U.S. at 326 (emphasis added). If a party has reason to believe that only some of its claims are being adjudicated, it is not on notice that it must bring forth all of its evidence supporting each and every claim. St. Paul Mercury Ins. Co., 224 F.3d at 435 (holding that the entry of summary judgment on fraud and conspiracy claims was not sufficient notice that the court would enter summary judgment on a malicious prosecution claim); Judwin Props, Inc., 973 F.2d at 436-37 (holding that the plaintiff had no notice that the court was contemplating entry of judgment on its tort claims where the defendant only moved for judgment on the contract claims); NL Indus., Inc., 940 F.2d at 966-67 (stating that the appellee could not take advantage of the district court's sua sponte judgment by retroactively arguing that its motion for partial summary judgment was a motion for total summary judgment).

Because a litigant "cannot read over the judge's shoulder, or penetrate his memory," the nonmoving party must also have some notice of what "contention" or issue is placing his case in jeopardy. Davis, 561 F.2d at 571 (quoting Soley v. Star & Herald Co., 390 F.2d 364, 369-70 (5th Cir. 1968)). Notice that a

particular element of a cause of action is being challenged with summary judgment does not put a party on notice that every element is being challenged. See Washington v. Resolution Trust Corp., 68 F.3d 935, 939 (5th Cir. 1995). Thus, in Washington, this court held that it was an abuse of discretion for the district court to enter summary judgment on plaintiff's breach and causation elements when the motion focused solely on the element of duty. Id. at 940.

Similarly, in HS Resources, Inc. v. Wingate, 327 F.3d 432, 437-38 (5th Cir. 2003), this court was concerned with the "[district] court's resolution of an issue that neither party had yet asked it to resolve." Id. at 440-41. The record showed that the plaintiff was not given an opportunity to respond because "[t]he first time the specter of the voluntariness of [its] payment arose was during the hearing on the parties' dispositive motions, and even then it was mentioned only in passing by the court." Id. at 441. Although the merits of the plaintiffs' recapture claim had been addressed in a preliminary injunction motion, the plaintiff never had an opportunity to address the exact issue the district court based its ruling on. Id.

Here, we find that the district court acted sua sponte because none of the parties addressed the merger clause in any fashion, including in all four matters the defendants point us to as matters outside the pleadings. Nor did Wireless Toyz, the only defendant to file an answer, raise the merger clause as an affirmative defense, or raise any other defense that could have implicated the merger clause. Compare Kron v. First Fed. Savs. & Loan Assoc. of Hattiesburg, 449 F.2d 865, 867 (5th Cir. 1971) (finding that conversion was not an unfair surprise where the appellee had raised the relevant defense in its answer and there was ample time to conduct discovery on the issue). While the defendants seek to cast the merger clause as a mere defense that negates the element of

reliance, they never argued this in their 12(b)(6) Motion.[10] And that is the point. Whether an affirmative defense or not, it was certainly obscure enough that the plaintiffs should have had some notice before it was adjudicated.

Moreover, the potential non-pleading matters that give this court the most pause–the references to factual allegations and testimony concerning Individual Defendants' alleged personal conduct–were mostly submitted to defeat a Rule 12(b)(2) jurisdictional argument that the defendants placed in their 12(b)(6) Motion. See Benchmark Elecs., Inc., 343 F.3d at 725-726 (holding that it would be unfair for the defendant to be allowed to lull the plaintiff into a summary judgment motion). They were not submitted to support the sufficiency of the pleadings under a Rule 12(b)(6) standard and did not go towards the 12(b)(6) issues. Under no possible interpretation could the matters presented to the district court have placed either party on notice that the court was contemplating summary judgment based on the Franchise Agreement's merger clause. In short, the district court unfairly surprised General Retail.

Finally, we find that the second purpose of Rule 56(c)–preventing the premature cutoff of discovery–favors reversal. Even Wireless Toyz and JSB believed that, as late as February 22, 2008, two months after the district court's November 17, 2005 order of dismissal, there had been insufficient time to conduct discovery. While the district court permitted General Retail to take some discovery, it limited discovery from Individual Defendants, including depositions, to the jurisdictional issues. It is unfair to limit depositions from key owners and officers of the corporate defendants to jurisdictional issues, over General Retail's protest, only to dispose of a substantive claim on a fact issue. See Benchmark Elecs., Inc., 343 F.3d at 725-726 (holding that the district court

---

[10] It is likely that the defendants could have submitted the Franchise Agreement with a 12(b)(6) motion to dismiss without converting the motion into a summary judgment motion. See Collins, 224 F.3d at 498-99.

unfairly converted the motion for judgment on the pleadings into a summary judgment motion when it had previously stayed discovery).

2. Harmless Error Analysis

Despite the strictness of the notice rule, failure to give notice is considered harmless if either (1) the nonmovant has no additional evidence or (2) all of the nonmovant's additional evidence is reviewed by the appellate court and none of it creates a genuine issue of material fact.[11] Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 28 F.3d 1388, 1396 (5th Cir. 1994) (quoting Sharif-Munir-Davidson Dev. Corp., 992 F.2d at 1403 n.7)). "[T]he party seeking to avoid summary judgment must present specific evidence that creates a genuine issue of material fact, or at least identify how additional discovery would yield such an issue." Nowlin v. Resolution Trust Corp., 33 F.3d 492, 504 (5th Cir. 1994) (citations omitted) (holding error harmless where the plaintiffs presented no shred of hard evidence and failed to state what the evidence they wanted to present was); compare St. Paul Mercury Ins. Co., 224 F.3d at 435 (holding that the lack of notice was not harmless where the defendant asked for a continuance to proffer testimony that could have created a genuine issue of material fact). Of course, if a review of the record reveals insufficient reasons to uphold the district court's order, the error was not harmless. See Nowlin, 33 F.3d at 505 (stating that "[i]f the nonmovant fails to make such a showing, and the motion is otherwise appropriate, then the lack of notice will be considered harmless error . . .") (emphasis added) (citations omitted).

The defendants argue that the even if the district court failed to provide

---

[11] Also, "where the party against whom summary judgment is granted moves for reconsideration . . . but does not, in that motion, challenge the procedural propriety of the summary judgment ruling, our court has reviewed the asserted procedural irregularity, raised for the first time on appeal, only for plain error." Love v. Nat'l Med. Enters., 230 F.3d 765, 771 (5th Cir. 2000) (citations omitted). Here, however, we apply the harmless error standard because General Retail urged the district court to reconsider because it had not been given sufficient notice.

sufficient notice, we should uphold its decision because the error was harmless. They argue that all of General Retail's claims, including its breach of contract claim, are premised upon misrepresentations that the Franchise Agreement's merger clause bars General Retail from relying on. Finally, they argue that General Retail has failed to point to any additional evidence that could create a genuine issue of material fact. In response, General Retail states that a review of the entire record–not just the excerpts in Plaintiffs' Appendix–reveals additional evidence creating a genuine dispute over material facts. We agree, and briefly discuss the merger-clause defense to show why.

As a general rule, Texas law does not permit parties to avoid fraud claims based on the existence of a merger clause in a related contract.[12] Schlumberger Tech. Corp. v. Swanson, 959 S.W.2d 171, 179 (Tex. 1997) (citation omitted). In Schlumberger, however, the Texas Supreme Court held that this general principle does not prohibit parties from bargaining for a release from future fraud claims. Id. In order to preclude a claim for fraud, the court held that a release must "clearly express[] the parties' intent to waive fraudulent inducement claims, or . . . disclaim[] reliance on representations about specific matters in dispute." Id. at 181. "The contract and circumstances surrounding its formation determine whether the disclaimer of reliance is binding." Id. at 179 (citations omitted). In Schlumberger, that standard was met, in part, because the parties entered into a settlement agreement with the clear purpose of ending all disputes between them "once and for all." Id. at 180.

While Schlumberger was limited to releases, subsequent courts, including this one, have held that merger clauses can also bar claims of fraud by negating the element of reliance. See, e.g., U.S. Quest Ltd. v. Kimmons, 228 F.3d 399, 403 (5th Cir. 2000) (holding that the merger clause, which expressly disavowed the

---

[12] While not addressing the choice of law issue, both parties have applied Texas law to the case.

existence of any other agreements, communications or understandings, expressly contradicted the plaintiff's allegation that there was a second oral agreement); Spring Window Fashions Div. v. Blind Maker, Inc., 184 S.W.3d 840, 874-75 (Tex. App.–Austin 2006, no pet.) (finding that the merger clause absorbed some, but not all, of the alleged misrepresentations). Moreover, we have concluded that the merger clause itself does not have to explicitly mention or refer to prior representations, so long as the entire agreement as a whole indicates that there was a clear unequivocal disclaimer of reliance. Armstrong v. Am. Home Shield Corp., 333 F.3d 566, 571 (5th Cir. 2003); see also Playboy Enters., Inc. v. Editorial Caballero, S.A. DE C.V., 202 S.W.3d 250, 257-58 (Tex. App.–Corpus Christi 2006, pet. filed) (holding that the merger clause barred the fraud claim where the contract specifically contradicted the alleged oral agreement).

To illustrate, in Armstrong, the plaintiff was hired by the defendant to implement cost savings programs. 333 F.3d at 567-70. He agreed to be paid on an incentive basis, which ultimately led him to sue because the defendant had allegedly misrepresented information that made it difficult for him to generate both savings for the company and income for himself. Id. Despite the lack of "no reliance" language in the merger clause, the court found that the agreement as a whole made up the difference. Id. at 571. For example, the plaintiff argued that he relied upon the defendant's claim that it would expand a particular program, but his employment agreement stated that the defendant had the "sole right to determine whether to implement [the program.]" Id. (quotations omitted). In addition, the plaintiff complained that he relied on the defendant's claim that prices he was shown were based on "historical and current cost data," but his employment agreement stated that the defendant made "no representations, warranties, and/or guarantees of the accuracy of the numbers and/or assumptions, the savings to be realized . . . ." Id.

In the instant case, there is too little information in Plaintiffs' Appendix

to uphold the district court's ruling. The merger clause reads as follows:

> This Agreement and the Manuals contain all of the covenants and agreements of the parties with respect to this subject matter, and supersede any and all prior or contemporaneous agreements, whether oral, written, express or implied, between the parties with respect to this subject matter. The attached Addendum is hereby incorporated in and made a part of this Agreement.

Its express terms include only covenants and agreements, it does not disclaim prior representations. To ascertain whether this is an enforceable disclaimer of reliance, a court would have to look beyond the three-page excerpt in Plaintiffs' Appendix to the whole Franchise Agreement and, perhaps, to parol evidence. See Armstrong, 333 F.3d at 571.

In addition, contrary to the defendants' argument, General Retail has pointed us to other evidence in the record that creates a genuine dispute over a material fact. Most importantly, Section 11.2 of the Franchise Agreement states:

> Except as provided in the Offering Circular delivered to the Franchise Owner, the Franchise Owner acknowledges that Wireless Toyz has not, either orally or in writing, represented estimated or projected any specified level of sales, cost or profits for this Franchise, nor represented the sales, cost or profit level of any other Wireless Toyz Store.

Elsewhere, General Retail warranted that based on "the information disclosed in the Offering Circular. . . it was financially able to accept the risks associated with [the Wireless Toyz franchise]." Since many of General Retail's alleged misrepresentations came directly from the Offering Circular, the district court should consider the effect of these passages. The district court previously stated that "statements and representations not incorporated in the Franchise Agreement are nothing more than 'puffing,' or sales talk . . . ." In light of the two clauses referenced above, it should consider whether statements in the Offering

26

Circular are incorporated into the Franchise Agreement.

Finally, we make some additional observations to help on remand. General Retail argued on appeal that the district court erred by entering Final Judgment without ever dismissing its DTPA, TBOA, MFIL, negligent misrepresentation or accounting claims. We add that the district court also did not explicitly address the merits of the breach of contract claim, except to deny the plaintiffs' motion for partial summary judgment without prejudice. While we have assumed that the district court meant to include all of the claims based on the misrepresentation in its description of "fraud claims," it never expressly said it was doing so. See St. Paul Mercury Ins. Co., 224 F.3d at 435 (stating that "[p]art of the uncertainty [of the Rule 56 review] stems from the district court's perception of the . . . claims as being virtually synonymous").

On remand, the district court is free to consider the arguments urged by the defendants, first in Wireless Toyz's opposition to the motion for leave to file the First Amended Complaint, and later in the defendants 12(b)(6) Motion, just as it is free to consider the effect of the merger clause. But it should analyze each claim separately, or explain why all of the claims can be addressed by a single analysis.

## B. Personal Jurisdiction

General Retail challenges the district court's dismissal of Individual Defendants for lack of personal jurisdiction. It argues that Individual Defendants are subject to the court's jurisdiction because they: (1) are "primary participants" of an intentional tort directed at the state of Texas; and (2) intentionally sent written misrepresentations into the state of Texas. In addition, General Retail notes that it consistently referred to the defendants collectively, as "Defendants," throughout the First Amended Complaint. As such, they argue that each allegation must be taken as true for each defendant.

Individual Defendants respond that all of their alleged contacts were

taken in a corporate capacity. Accordingly, they argue, Texas' fiduciary-shield doctrine prohibited their consideration. With respect to Joe and Jack Barbat, they argue that jurisdiction is improper because the First Amended Complaint mentions them but once: to identify them as parties. Similarly, they note that after being identified, there was only one reference to Ebner: the allegation that he and Wiley met at the "discovery day" program. Finally, with regard to Simtob, Individual Defendants argue that the only contacts alleged were either his contacts from Michigan, or contacts in a corporate capacity.

We review the district court's dismissal for lack of personal jurisdiction de novo. Alpine View Co. v. Atlas Copco AB, 205 F.3d 208, 214 (5th Cir. 2000). The plaintiff bears the burden of establishing a district court's jurisdiction over a non-resident if the facts are in dispute, but it need only make a prima facie case if the district court rules without an evidentiary hearing. See Wilson v. Belin, 20 F.3d 644, 648 (5th Cir. 1994) (citation omitted). Proof by a preponderance of the evidence is not required. Bullion v. Gillespie, 895 F.2d 213, 217 (5th Cir. 1990) (citation omitted). Also, all uncontroverted allegations are taken as true and fact conflicts are resolved in the plaintiff's favor. Lewis v. Fresne, 252 F.3d 352, 356 (5th Cir. 2001) (citation omitted).

In a diversity action, a federal court's jurisdiction extends over a nonresident defendant only to the extent permitted by state law. Fed. R. Civ. P. 4(e)(1). A district court must determine whether both the state's long-arm statute and federal due process permits the court to exercise personal jurisdiction. Ruston Gas Turbines, Inc. v. Donaldson Co., 9 F.3d 415, 418 (5th Cir. 1993). Because the Texas long-arm statute extends to the limits of federal due process, the two-step inquiry collapses into one federal due process analysis. Wilson, 20 F.3d at 647. Federal due process requires a plaintiff to prove: (1) that the non-resident purposely availed himself of the benefits and protections of the forum state by establishing minimum contacts with the state; and (2) that

the exercise of jurisdiction does not offend "traditional notions of fair play and substantial justice." Id. at 647 (citations omitted). Additionally, "[t]here are two types of 'minimum contacts': those that give rise to specific personal jurisdiction and those that give rise to general personal jurisdiction." Lewis, 252 F.3d at 358.

In this case, General Retail no longer contends, as it did below, that general jurisdiction exists over Individual Defendants. We therefore focus solely on specific jurisdiction, which exists when a non-resident defendant has purposefully directed its activities at the forum state and the litigation results from alleged injuries that arise out of or relate to those activities. See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985). If these minimum contacts are shown, jurisdiction exists unless the defendant can make a compelling case that it would violate traditional notions of fair play and substantial justice. Wein Air Alaska, Inc. v. Brandt, 195 F.3d 208, 215 (1999). Factors that courts consider to make this determination include: (1) the burden on the defendant; (2) the interest of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolutions of controversies; and (5) the shared interest of the several states in furthering fundamental social policies. Bullion, 895 F.2d at 216.

1. Defendants Joe Barbat, Jack Barbat and Ebner

We uphold the district court's dismissal of Joe Barbat, Jack Barbat and Ebner because General Retail failed to demonstrate that they purposefully directed any activities into the forum state. While it is true that a single act can confer personal jurisdiction over a defendant if that act gives rise to the claim being asserted, Lewis, 252 F.3d at 359 (citation omitted), General Retail has not carried its burden to show that these individuals could reasonably expect to be hailed into court in Texas, see Wilson, 20 F.3d at 649-48. The First Amended

29

Complaint merely identifies who Joe and Jack Barbat are. While it mentions Ebner one more time, the allegation merely states that the Ebner "met" Wiley. There is nothing in the First Amended Complaint that ascribes specific conduct or statements to these individuals. Contrary to General Retail's argument, it is not enough to simply rest on the use of the collective term, "Defendants," in the allegations. See Rush v. Savchuk, 444 U.S. 320, 332-33 (1980) (holding that aggregating the defendant into a collective of "defending parties" did not satisfy federal due process).

Moreover, the uncontroverted affidavits submitted by these individuals demonstrate that not one of them traveled to Texas, or directed any communications to Texas, in connection with the sale of a Wireless Toyz franchise to Wiley. The only individual out of this group who ever communicated with Wiley before he signed the Franchise Agreement was Ebner. That meeting occurred in Michigan after Wiley had received the Offering Circular and marketing materials from Simtob. Since General Retail's claims against the individuals are premised upon pre-contract misrepresentations, the lack of communications with Wiley pre-contract is significant.

Lastly, the affidavits and deposition testimony General Retail relies upon do not demonstrate a prima facie case of jurisdiction. At most, they prove that Ebner helped prepare the Offering Circular and Joe Barbat approved it. The evidence does not establish that Joe Barbat or Ebner "purposefully directed" the Offering Circular or marketing materials into Texas or to General Retail. See Southmark Corp. v. Life Investors, Inc., 851 F.2d 763, 772-73 (5th Cir. 1988) (finding no personal jurisdiction where there was no evidence that the individuals aimed their allegedly tortious activities at Texas or knew that the brunt of the plaintiff's injuries would be felt in Texas). Rather, the testimony establishes that by the time all three individuals met Wiley he had already received the marketing materials and the Offering Circular. While Ebner and

Joe Barbat, at least, might have "foreseen" that they would be sued in Texas, the individuals could not "reasonably anticipate being haled into court" in Texas. Wilson, 20 F.3d at 648-49 (holding that communication into the forum state was not purposefully directed into the state); compare Lewis, 252 F.3d at 359 (permitting the exercise of jurisdiction based on communications that were knowingly made in Texas).

2. Defendant Simtob

While we do not find sufficient contacts for the other individuals, General Retail has submitted sufficient evidence to justify the assertion of personal jurisdiction over Simtob. In contrast to the other individuals, the uncontroverted allegations in the First Amended Complaint allege specific contacts between Simtob and Texas. For example, Simtob allegedly sent the marketing materials and Offering Circular that contained the alleged misrepresentations to General Retail in Texas. The evidence introduced by the plaintiffs in the 12(b)(2) Response corroborated the allegations, and established additional contacts with Texas. Simtob drafted the portion of the Offering Circular that made representations concerning the Wireless Toyz model store's profitability; he presented General Retail with the Franchise Agreement in Texas; and he accepted the executed Franchise Agreement and franchise fee in Texas. Thus, General Retail established that Simtob purposefully directed his activities to Texas because he created and intentionally sent the Offering Circular to Texas. Because General Retail's alleged injuries arise from those contacts, namely, the Offering Circular, Simtob has sufficient minimum contacts with Texas. See Lewis, 252 F.3d at 359.

We also find that the fiduciary-shield doctrine–which prohibits the attribution of corporate acts to corporate officers–does not bar the exercise of personal jurisdiction over Simtob. See Siskind v. Villa Foundation for Educ., Inc. 642 S.W.2d 434, 437-38 (Tex. 1982). This argument was accepted by the

district court, which cited to <u>Donovan v. Grim Hotel Co.</u>, 747 F.2d 966, 973 (5th Cir. 1984), in support of its decision.[13]  Rather than supporting jurisdiction, however, <u>Donovan</u>, demonstrates why the fiduciary-shield doctrine does not protect Simtob.

In <u>Donovan</u>, the individual defendant, founder and president of the five corporate defendants, argued that the district court lacked personal jurisdiction over him because his only contacts with Texas were in a corporate capacity.  The court rejected this argument because he was being sued under a fair wage law in his personal capacity.  <u>Id.</u> at 973.  The court explained that neither Texas or federal law allowed the defendant to hide behind his corporate status.  Texas' fiduciary-shield doctrine did not bar jurisdiction because he was being sued for specific acts, which had reasonably foreseeable consequences within Texas.  <u>Id.</u> at 973 n.11 (citing <u>Siskind</u>, 642 S.W.2d at 437-38).  So while the fiduciary-shield doctrine could prohibit this court from ascribing acts of the Wireless Toyz to Simtob, it does not prohibit Simtob from being held personally liable for his own tortious conduct simply because he is an officer of a corporation.

Finally, jurisdiction is proper because Simtob has not established that the exercise of jurisdiction over him would violate traditional notions of fair play and substantial justice.  <u>See</u> <u>Wein Air Alaska, Inc.</u>, 195 F.3d at 215.  Only one factor, the burden on Simtob, weighs in his favor.  But General Retail's interest in obtaining convenient and effective relief in Texas is just as great.  Since Texas has an interest in protecting its franchisees and judicial economy is served by maintaining the action in one single forum, it is fair to make Simtob adjudicate his claim in Texas.

## C. Failure to Plead with Particularity

---

[13] The district court did not expressly state that it was relying on the fiduciary-shield doctrine, but it cited to <u>Donovan</u> when discussing the fraud claims against Individual Defendants.

A dismissal for failure to state fraud with particularity is a dismissal on the pleadings, which we review de novo.[14] <u>Shushany v. Allwaste, Inc.</u>, 992 F.2d 517, 520 (5th Cir. 1993). We accept all of the well-pleaded factual allegations as true. <u>Norman v. Apache Corp.</u>, 19 F.3d 1017, 1021 (5th Cir. 1994). When a defendant challenges a complaint for failing to plead with the particularity demanded by Rule 9(b), we look to ensure that the identity of the speaker along with the particulars of time place and content are alleged. <u>Tuchman v. DSC Commc'n</u>, 14 F.3d 1061, 1068-69 (5th Cir. 1994) (citing <u>Tel-Phonic Servs. v. TBS Int'l, Inc.</u>, 975 F.2d 1134, 1139 (5th Cir. 1992)). "Put simply, Rule 9(b) requires 'the who, what, when, where, and how' to be laid out." <u>Benchmark Elecs., Inc.</u>, 343 F.3d at 724 (citation omitted).

The plaintiffs brought two different fraud claims against the remaining defendants, Wireless Toyz, JSB and Simtob. First, they alleged that they were fraudulently induced to purchase the Wireless Toyz franchise by "serious misrepresentations," including misrepresentations concerning the gross level of sales necessary for a franchise to reach a financial "break even" point. In support of this claim, they identified nine alleged misrepresentations in the Offering Circular and marketing materials which they alleged Simtob sent in early 2003. The alleged misrepresentations in the Offering Circular included the: (1) projection that a model retail franchise store was potentially profitable at the annual gross rate of $589,327; (2) description of how the sample numbers in Item 19 were compiled; (3) statement that "the Wireless Toyz business model

---

[14] General Retail challenges the district court's dismissal of its fraud claims under the heightened pleading requirements of Rule 9(b). On the other hand, the defendants argue in support of the district court's dismissal of both the fraud and DTPA claims. For a number of reasons, we will only address the fraud claim itself, and remand the case to the district court for further consideration on the DTPA claims. First, the district court's order only refers to the fraud claim. Second, the scope of the order was inconclusive at best. Third, issues of law potentially distinguish the claims and should be addressed. With regard to the DTPA claim, for example, the parties will have to address whether the heightened pleading standard of Rule 9(b) applies.

was a profitable one due to economics realizable as the result of being a Wireless Toyz franchisee[]"; and (4) statement that the defendants pass on group purchasing power benefits.

The alleged misrepresentations in the marketing materials included the claims that:  (1) franchisees would save over $10,000 in the first year and at least $20,000 overall compared to an independent start-up; (2) franchisees need half the working capital to achieve an operational break even point as compared to an independent start-up; (3) Wireless Toyz has the ability to negotiate a lease that would make a large difference in the net financial results; (4) Wireless Toyz can provide reliable assistance with a franchisees' business plan; and (5) franchisees have greater purchasing power due to the advantages provided by Wireless Toyz's volume purchasing.

Based on these allegations, General Retail has sufficiently put Wireless Toyz and Simtob on notice as to the challenged assertions in the first part of its claim.  General Retail has alleged that Wireless Toyz and Simtob stated in the Offering Circular that there were no material differences between the stores being offered for franchise and those being used to complete the schedule in the Offering Circular.  It now alleges that was a false statement.  Also, General Retail has alleged that Wireless Toyz and Simtob claimed they would pass on the benefits of group buying power, but never intended to pass on those benefits of group purchasing power.  In other words, while the model stores disclosed in the Offering Circular received favorable prices and other allowances because of the size of the group's business, Wireless Toyz's franchised stores paid normal rates.  Whether true or not, these allegations put Wireless Toyz and Simtob on notice of what they must defend.

On the other hand, the fraud claim against JSB does not satisfy the heightened pleading requirements.  There is not a single allegation that a JSB officer made any representations, much less misrepresentations.  The alleged

misrepresentations identified are in Wireless Toyz's marketing materials and Offering Circular and cannot be attributed to JSB in the absence of an alter ego claim.

## III.  CONCLUSION

In conclusion, we AFFIRM the dismissal of Jack Barbat, Joe Barbat and Ebner for lack of personal jurisdiction, but we REVERSE the dismissal of Simtob.  We AFFIRM the dismissal of General Retail's fraud claim against JSB only.  In all other respects, the judgment dismissing General Retail's claims is VACATED.  Each party shall bear its own costs.